SNEDIKER DEVELOPERS LIMITED PARTNERSHIP, Plaintiff,

v.

Margaret E. EVANS, Robert R. Webster, Jr., Florence Webster, Johnson Controls, Inc., a Wisconsin corporation, Hoover Universal, Inc., a Michigan corporation, and NSK Corporation, a Delaware corporation, jointly and severally, Defendants.

No. 89–72979.

United States District Court, E.D. Michigan, S.D.

Sept. 13, 1991.

Joseph Phillips, Ann Arbor, Mich., Jeffrey Haynes, Bloomfield Hills, Mich., for Snediker Developers Ltd. Partnership.

Allyn Kantor, Ann Arbor, Mich., Stanton G. Roesch, Saline, Mich., for Evans, and Robert R. and Florence Webster.

John Dunn, Paul Sorensen, Grand Rapids, Mich., for Johnson and Hoover.

William Schlecte, Ann Arbor, Mich., for NSK.

## MEMORANDUM AND ORDER

COHN, District Judge.

"The son shall not bear the iniquity of the father, neither shall the father bear the iniquity of the son: The righteousness of the righteous shall be upon him, and the wickedness of the wicked shall be upon him."

—*Ezekiel*, 18:20.

### I.

This is an action to recover the costs of cleaning up hazardous waste under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9601 *et seq.* Plaintiff, Snediker Developers Limited Partnership (Snediker), as purchaser, and defendants, Margaret E. Evans (Evans), Robert R. Webster, Jr. (Robert Webster) and Florence Webster (Florence Webster), as sellers, were parties to a land contract for sale of property owned by Evans and the Websters. After the execution of the contract, Snediker discovered that the property had been used as a dumping site for hazardous waste and that it would cost a substantial amount to make it useable. Also named as defendants are the corporate successors to Hoover Ball & Bearing (HB & B), the alleged generator of the hazardous waste on the property, namely: (1) Johnson Controls Corporation (Johnson), (2) Hoover Universal, Inc. (Hoover), and (3) NSK Corporation (NSK).[1] Snediker seeks: (1) to recover the cost of removing the hazardous waste, (2) issuance of an injunction requiring the various defendants to clean up the property, and (3) a declaratory ruling on liability for future "response" costs.[2] The corporate successors have filed cross-claims against the Websters and Evans. The cross-claims seek contribution from the Websters and Evans for the costs of handling the hazardous waste.

Now before the Court is the Websters and Evans' motion for summary judgment as to the corporate successors' cross-claims. Fed.R.Civ.P. 56(c). The Websters and Evans say they should be dismissed from the case because: (1) they are not the "owners" of the property, and (2) they did not own or operate the property at the time of the hazardous waste's disposal. The Court agrees. The Websters and Evans' motion for summary judgment will be granted.

### II.

The following facts, as gleaned from deposition testimony, affidavits and documents in the record are not in dispute.

#### A.

The property is comprised of two adjacent parcels, located south of Ann Arbor. The first parcel (Parcel I) is 75.9 acres and is to the east of the second parcel (Parcel II), which is of 40 acres.

During the 1940s, Robert R. Webster, Sr. and Clara Webster, husband and wife, acquired Parcel I and Parcel II. Upon the death of her husband, Clara Webster became the sole owner of the property. From 1974 to 1983, Clara Webster's son, Robert Webster, had operational control of the leasing and farming of the property. When she died in 1983, Clara Webster bequeathed the property to Robert Webster and her daughter, Evans. Evans was bequeathed Parcel I. Evans and Robert Webster were bequeathed Parcel II. Robert Webster then conveyed his one-half interest in Parcel II to himself and his wife, Florence.

---

[1] Johnson, Hoover and NSK will, hereinafter, be referred to collectively as "the corporate successors."

[2] On July 9, 1991, Snediker and the Websters and Evans entered into a settlement resulting in the mutual dismissal of all claims these parties had against one another.

## B.

In April 1988, the Websters and Evans sold the property to Snediker on land contract. The sale price was $500,000.00. The preliminary sales agreement provided Snediker with a time period within which to determine the property's suitability for home building. On August 25, 1989, at the expiration of the period, the land contract was executed. Under its terms, possession of the property was transferred to Snediker. The Websters and Evans continued to hold record title.

After the sale, Snediker learned that, during the 1960s, a small area of Parcel I had been used by HB & B as a hazardous waste disposal area.[3] The original dumping of the hazardous waste occurred no later than 1967. Some of the hazardous waste appears to have migrated from the area where it was deposited. However, there is no evidence that any hazardous waste has migrated to Parcel II.

## III.

The Websters and Evans seek summary judgment as to the CERCLA claim against them on the ground that they are not "covered person[s]" under 42 U.S.C. § 9607(a). CERCLA imposes liability for clean up of the waste under the circumstances here on four classes of persons: (1) current owners and operators of a facility, 42 U.S.C. § 9607(a)(1), (2) owners or operators of a facility at a time of disposal, 42 U.S.C. § 9607(a)(2), (3) generators of the wastes, 42 U.S.C. § 9607(a)(3), and (4) transporters of the wastes, 42 U.S.C. § 9607(a)(4). The term "facility" means, among other things, "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It is undisputed that §§ 9607(a)(3), (a)(4) are inapplicable here. Thus, the corporate successors effort to seek contribution hinges on their ability to show that the Websters and Evans: (1) are current owners and operators of a facility, i.e. the property, under § 9607(a)(1), or (2) were owners or operators of the facility at the time the hazardous waste was disposed under § 9607(a)(2). The corporate successors have failed to make this showing as a matter of law.

## A.

Section § 9607(a)(1) has been interpreted to impose "strict liability on the current owners of any facility which releases or threatens to release a toxic substance." *Tanglewood East Homeowners v. Charles–Thomas, Inc.*, 849 F.2d 1568, 1572 (5th Cir.1988); *see also United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 (11th Cir.1990). The current owners of a facility previously contaminated are not excluded from liability. *New York v. Shore Realty Corp.*, 759 F.2d 1032 (2nd Cir.1985). However, neither the Websters nor Evans are currently owners of a facility within the meaning of § 9607(a)(1). CERCLA's definition of the terms "owner or operator" protects secured creditors who do not participate in the management of a facility. 42 U.S.C. § 9601(20)(A);[4] *See also United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 (11th Cir.1990). It is undisputed the Websters and Evans do not participate in the management of the facility. Moreover, as stated in Part II, the Websters and Evans are land contract vendors who retain title to the property merely to protect their security interest in it. *See In re Douglas A. Carr*, 52 B.R. 250, 251 (E.D.Mich.1985) (under a sale of real estate on land contract, "the vendee obtains the right to possession of the premises, while the vendor retains the deed as security for payment").

The holding of the Court of Appeals for the Ninth Circuit in *In re Bergsoe Metal Corp.*, 910 F.2d 668, 971 (9th Cir.1990), strongly suggests that land contract ven-

---

**3.** There is no dispute Robert R. Webster, Sr. was paid by HB & B for his permission to dispose the hazardous waste on the property.

**4.** 42 U.S.C. § 9601(20)(A) states in relevant part: (ii) in the case of an onshore facility or an offshore facility, any person owning or operating such facility ... Such term does not include a person, who, without participating in the management of a vessel or facility, holds indicia of ownership primarily to protect his security interest in the vessel or facility.

dors like the Websters and Evans fall within CERCLA's security interest exception. In *Bergsoe*, the defendant sold land onto which hazardous waste had been deposited in return for a promissory note and a mortgage on the property. The Ninth Circuit concluded the defendant retained an interest in the property as security. It stated:

> That [defendant] holds paper title to the [property] does not, alone, make it an owner of the facility for purposes of CERCLA; under the security interest exception the court must determine *why* the [defendant] holds such indicia of ownership. Here, there is no doubt that the [defendant] has the deed in the [property] primarily to ensure that Bergsoe would meet its obligation under the leases....

*Bergsoe*, 910 F.2d at 671. As the result, the Ninth Circuit held the defendant was not an "owner" for the purposes of § 9601(20)(A) and was not liable for cleanup costs under § 9607(a)(1). The Websters and Evans, as land contract vendors, are in a like position. Thus, like the defendant in *Bergsoe*, they are not owners within the meaning of CERCLA and are not responsible for cleanup costs under § 9607(a)(1).[5]

### B.

■ The corporate successors also say the Websters and Evans were owners of the property at the time of the disposal of the hazardous wastes and thus are liable for cleanup costs under § 9607(a)(2). CERCLA defines the term "disposal" in 42 U.S.C. § 9601(29) by adopting the meaning provided in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3): the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any ... hazardous waste into or onto the land ... so that such hazardous waste or any constituent thereof may enter the environment."

### 1.

Applying this definition, it is clear the Websters and Evans did not own the property at the time of the hazardous waste's disposal. As stated in Part II, HB & B discharged the hazardous waste onto the property during the 1960s. The Websters and Evans did not inherit the property from Clara Webster until 1983. *See Cadillac Fairview/California Inc. v. Dow Chemical Co.*, 21 E.R.C. 1108, 1113 (C.D.Cal.1985), *rev'd on other grounds*, 840 F.2d 691 (9th Cir.1988) (defendants, who had been owners of property after Dow Chemical and others had disposed hazardous waste, not liable for cleanup costs under § 9607(a)(2)).

### 2.

Despite the 16 year interval between HB & B's dumping of the hazardous waste and the Websters and Evans' ownership of the property, the corporate successors say the Websters and Evans were owners of the property at the time of the hazardous waste's disposal, thus incurring cleanup liability under § 9607(a)(2) since the deposited hazardous waste migrated, that is spread, when they owned the property. Their argument is based on the premise that hazardous waste's general movement in migration is a form of disposal, i.e. leaking, under § 6903(3). However, this argument is unpersuasive.

First, several courts have held that the term "disposal" under CERCLA does not encompass the migration of hazardous waste that occurs passively, i.e. without either the owner's affirmative act or negligent omission. *See Ecodyne Corp. v. Shah*, 718 F.Supp. 1454, 1457 (N.D.Cal. 1989) (under CERCLA, a person does not dispose hazardous waste unless he or she affirmatively does something leading to its introduction into the environment); *In re Diamond Reo Trucks, Inc.*, 115 B.R. 559, 565 (W.D.Mich.1990) ("the mere ownership of the site during a period of time in which migration or leaching may have taken place, without any active disposal activities,

---

5. There apparently is no dispute among the parties that the Websters and Evans' are not owners within the meaning of § 9601(20)(A). The corporate successors have not attempted to rebut the Websters and Evans' argument that land contract vendors, who retain title to property only for security, are not liable for cleanup costs under § 9607(a)(1).

does not bring [defendant] within the liability provision of § 9607(a)(2)").

Second, none of the cases on which the corporate successors rely to support their broad definition of disposal, *CPC International, Inc. v. Aerojet–General Corp.*, 759 F.Supp. 1269, 1278 (W.D.Mich.1991); *Emhart Industries, Inc. v. Duracell International, Inc.*, 665 F.Supp. 549 (M.D.Tenn. 1987); *United States v. Waste Management, Inc.*, 734 F.2d 159 (4th Cir.1984), held that the term, under CERCLA, may encompass the general migration of hazardous waste that occurs passively.[6]

Last, assuming that any hazardous waste may migrate long after it has been introduced into the environment, the corporate successor's sweeping interpretation of the term disposal would effectively impose cleanup liability on any owner in a chain of title. The Court is satisfied that if the drafters of CERCLA had intended such a far reaching consequence, they would have said so explicitly.

Thus, the mere migration of hazardous waste, without more, does not constitute disposal within the meaning of § 6903(3). There was no active conduct on the part of the Websters and Evans that resulted in the introduction of hazardous waste into the environment. As a result, the Websters and Evans cannot be said to have disposed hazardous waste into the environment when they owned the property and are not liable for cleanup costs pursuant to § 9607(a)(2).

**C.**

◼ The corporate successors say Robert Webster is liable, as an operator of a facility, under § 9607(a)(2). This argument also lacks merit. An operator of a facility may not be liable for cleanup costs under § 9607(a)(2) unless there is some nexus between his or her role as operator and the decision to dispose the hazardous waste. *CPC International*, 731 F.Supp. at 788; *BCW Associates, Ltd. v. Occidental Chemical Corp.*, No. 86–5947 slip op. at 18, 1988 WL 102641 (E.D.Pa. September 30, 1988); *United States v. Pacific Hide and Fur Depot*, 716 F.Supp. 1341 (D.Idaho 1989). Here, there is simply no nexus between Robert Foster's role as operator and the decision to dispose the hazardous waste. The disposal of the hazardous wasted occurred no later than 1967, and Robert Webster did not deal with the property until 1974, or seven years after the hazardous waste's disposal. He therefore had no involvement with the disposal decisions.[7]

**D.**

Thus, the Websters and Evans are not liable for the clean up of hazardous waste under CERCLA. They are not current owners and operators within the meaning of § 9607(a)(1). Moreover, there were no owners or operators of the property at the time of the hazardous waste's disposal.[8]

**IV.**

◼ NSK argues at length the Websters and Evans should be liable for cleanup

---

**6.** For instance, in *CPC International*, 759 F.Supp. at 1278, a defendant was found to be an owner or operator of a facility at the time of disposal. However, the court held the defendant liable because it failed to comply with its contractual obligation to operate a groundwater treatment system designed to purge the ground water of hazardous waste. The court found that defendant's breach of the agreement constituted "spilling" or "leaking," both of which are contained within the definition of disposal. *See generally CPC International v. Aerojet–General Corp.*, 731 F.Supp. 783, 789 (W.D.Mich.1989).

In *Emhart Industries*, 665 F.Supp. at 574, the court held defendant disposed hazardous waste, within the meaning of CERCLA. However, the court also found the defendant, by spilling PCBs in the manufacturing process and dumping

them outside its plant was actively engaged in the introduction of hazardous waste into the environment which in turn migrated through ground water.

**7.** The corporate successors say the farming activities directed by Robert Webster may have facilitated the spread of hazardous waste. However, this assertion is pure speculation. There is no evidence of record to suggest that Robert Webster's decisions as to farming exacerbated the migration of the hazardous waste.

**8.** In light of the Court's determination that the Websters and Evans are not covered persons under § 9607(a), the issue as to whether they are protected by the "innocent owner" defense, 42 U.S.C. § 9607(b)(3), is moot.

costs even if they are not covered persons under § 9607(a). It says that, since the Websters and Evans inherited contaminated property, the proceeds derived from its sale to Snediker constitutes a windfall. Thus, NSK says, the Court should invoke its equitable powers to hold that the Websters and Evans must contribute to the costs of the cleanup.

While creative, this argument is unpersuasive. It is true that courts have occasionally invoked what is characterized as equitable power in CERCLA suits to implement narrowly tailored remedies. *Sunnen Products Co. v. Chemtech Industries, Inc.*, 658 F.Supp. 276 (E.D.Mo.1987); *Reardon v. United States*, 731 F.Supp. 558 (D.Mass. 1990); *T & E Industries v. Safety Light Corp.*, 680 F.Supp. 696 (D.N.J.1988). However, the facts in all of these cases are readily distinguishable from those at issue. For example, in *T & E Industries*, 680 F.Supp. at 704–05, the Court invoked equitable power to impose a mandatory injunction to compel defendants to comply with their obligations under CERCLA. Thus, in *T & E Industries*, the Court used equitable power only to effectuate the provisions of CERCLA.

Here, in contrast, NSK is asking the Court to use equitable power to trample the explicit language of § 9607(a). In enacting that section, Congress made an implicit determination that only certain parties are liable for cleaning up hazardous waste. As stated, *supra*, neither the Websters nor Evans falls within the gamut of § 9607(a). As a result, in holding the Websters and Evans liable for cleanup costs, the Court would necessarily be ignoring Congress' intent in enacting § 9607(a).[9]

 Moreover, NSK's argument is based on the wholly untenable assumption that the acquisition of property by inheritance and the proceeds of the sale of such property is not a right outside of any obligation under CERCLA. This is simply untrue. For instance, under 42 U.S.C. § 9601(35)(A)(iii), a person who acquires property by inheritance is entitled to assert the innocent landowner defense provided under 42 U.S.C. § 9607(b)(3).[10]

### V.

The Websters and Evans' motion for summary judgment as to the corporate successors' cross claims is GRANTED.

SO ORDERED.

---

9. What NSK appears to be arguing has echoes of what the Oxford Companion to Law defines as equity of a statute:

> The general intent and spirit of a statute rather than the strict letter thereof. It is founded on a theory of the sixteenth and early seventeenth centuries found in St. Germain's *Doctor and Student* and in Coke, of a special 'equity' which controlled statutes by extending them in some cases and restricting them in others. A certain amount of learning grew up around this and some of the Abridgements treat it as an aspect of statute law. In the late seventeenth and eighteenth centuries the theory shrank and has no long since disappeared.

D. Walker, *The Oxford Companion to Law* 427 (1980).

10. In arguing that the corporate successors may seek contributions from the Websters and Evans, NSK says: (1) the estate of Robert R. Webster, Sr. and Clara Webster are liable for cleanup costs under § 9607(a)(2) since they undisputedly owned the property at the time of the hazardous waste's disposal, (2) the corporate successors therefore have a viable claim for contributions from the estates of Robert R. Webster, Sr. and Clara Webster, and (3) under Michigan law, pursuant to M.C.L.A. § 700.755, the corporate successors have the right to recover against the heirs or devisees who received real property from the estates of Robert R. Webster, Sr. and Clara Webster. However, NSK's reliance on M.C.L.A. § 700.755 is misplaced. The statute applies only to "creditors" of an estate. NSK has cited no case suggesting that the successor to a corporation that disposes hazardous waste on the property of a party liable under CERCLA is a creditor, within the meaning of M.C.L.A. § 700.755. Moreover, under M.C.L.A. § 700.755, a creditor's claim must be presented against the heirs of an estate within "60 days after the time when it accrues or becomes absolute." At the earliest, the corporate successors did not state a claim against the Websters and Evans until 1989, or nearly six years after they inherited the property. And there has been no attempt to reopen the estates of Robert R. Webster, Sr. or Clara Webster so claims could be presented and adjudicated in accordance with the Michigan Probate Code.